AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, a District of Columbia corporation; Phyllis Ball; Katherine Pieper; Gilbert Davis; Patricia Davis; Frederick L. Schwass; and Walter Bergman, Plaintiffs,

v.

The SCHOOL DISTRICT OF THE CITY OF GRAND RAPIDS, a Municipal corporation; Phillip Runkel, Superintendent of Public Instruction of the State of Michigan; State Board of Education of the State of Michigan; Loren E. Monroe, State Treasurer of the State of Michigan, Defendants,

and

Urma Garcia–Aguilar; Simon Aguilar; Bruce Bylsma; Linda Bylsma; Robert Comer; Penelope Comer; Clarence Covert; Rosalee Covert; Scipuo Flowers; Janice Flowers; John Leestma; and Shirley Leestma, Intervening Defendants.

No. G80–517 CA1.

United States District Court,
W.D. Michigan, S.D.

May 4, 1989.

Albert R. Dilley, Grand Rapids, Mich., for plaintiffs.

Hubbell & Hubbell by Stuart D. Hubbell, Traverse City, Mich., for intervening defendants Urma Garcia–Aguilar and Simon Aguilar, et al.

Farr & Oosterhouse by William S. Farr, John R. Oostema, Grand Rapids, Mich., for defendant Bd. of Educ. of G.R. Public Schools.

Frank J. Kelley, Atty. Gen. by Gerald F. Young, Asst. Atty. Gen., Lansing, Mich., for defendants Superintendent of Public Instruction, State Bd. of Educ. and State Treasurer.

## OPINION

ENSLEN, District Judge.

### Background

This case is now before the Court on plaintiffs' Motion for Reasonable Attorney's Fees and Costs under 42 U.S.C. § 1988. This Establishment Clause case has a long history in this Court. Plaintiffs, an organization and residents and taxpayers of Grand Rapids, Michigan, filed the complaint in the underlying action in August 1980. The complaint sought declaration that the "shared time" and "community education" programs of the Grand Rapids School District violated the Establishment Clause. Following a trial, this Court granted the declaratory relief and ordered a permanent injunction against the programs. *Americans United for Separation of Church and State v. Grand Rapids School District*, 546 F.Supp. 1071 (W.D.Mich.1982). Thereafter, the Sixth Circuit and the United States Supreme Court affirmed this decision. *Americans United for Separation of Church and State v. Grand Rapids School District*, 718 F.2d 1389 (6th Cir.1983); *Grand Rapids School District v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985). The issue of "entitlement" to fees under § 1988 was bifurcated from the issue of "amount" by Stipulation and Order on October 30, 1985. This Court by Opinion and Order on August 7, 1986 denied plaintiffs' request for fees. 641 F.Supp. 1. The Sixth Circuit, however, reversed on December 16, 1987 and on February 25, 1988, denied defendants' request for rehearing *en banc.* On March 17, 1988, the case was remanded to this Court for further proceedings "to determine the amount of reasonable attorney's fees to be awarded."

Following the completion of discovery, the parties by stipulation submitted a proposed Order Scheduling Events which was signed and entered by Magistrate Rowland on December 23, 1988. The evidentiary record concerning plaintiffs' fee request consists of the various affidavits filed by plaintiffs' attorneys, the affidavit of William S. Farr, and the transcript of the deposition of Mr. Albert Dilley, which was taken on November 14, 1988. Upon the filing of these documents, the Order Scheduling Events provides that "the evidentiary record is closed."

Ordinarily, where a plaintiff is a "prevailing party" within the meaning of 42 U.S.C. § 1988, the issues remaining are, first, what is the proper amount to be awarded for attorney's fees and costs; and second, how should the award of fees and costs be apportioned among the defendants. In this case, the parties have negotiated a resolution to the allocation issue, hence it need not be addressed. The only remaining issue—the proper amount of the award—is now ripe for resolution by this Court.

### Discussion

#### A. Attorney Fee Awards in Civil Rights Actions

Until relatively recently, federal courts used their general equity power in awarding attorney's fees to prevailing parties in civil rights actions. In *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Supreme Court "reaffirmed the 'American Rule' that each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary." *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). Therefore, a federal court can only, with a few exceptions, grant attorney's fees to a party when a statute authorizes such an award. In response to *Alyeska Pipeline*, Congress enacted the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988.

Section 1988 allows prevailing parties in civil rights litigation to recover their attorney's fees. Specifically, section 1988 in pertinent part provides that:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of

Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

According to the legislative history of § 1988, a reasonable attorney's fee is one that is "adequate to attract competent counsel, but ... [that does] not produce windfalls to attorneys." *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984); *Northcross v. Board of Education,* 611 F.2d 624, 633 (6th Cir. 1979). The United States Supreme Court in *Pennsylvania v. Delaware Valley I Citizens' Council for Clean Air,* 478 U.S. 546, at 565, 106 S.Ct. 3088, at 3098, 92 L.Ed.2d 439, at 456–457 (1986) in addressing federal fee-shifting statutes, including § 1988, wrote as follows:

> The statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, *the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from actual or threatened violation of specific federal laws.* Hence, if plaintiffs, such as Delaware Valley, find it possible to engage a lawyer based on the statutory assurance that he will be paid a 'reasonable fee', the purpose behind the fee-shifting statute has been satisfied.

*Id.* (emphasis added). *See also Coulter v. Tennessee,* 805 F.2d 146, 148–149 (6th Cir. 1986).

The Supreme Court has on a number of occasions addressed the specifics of calculating a reasonable and proper award of attorney's fees under § 1988. *See, e.g., Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (hereinafter *"Delaware Valley II"*); *Pennsylvania v. Delaware Valley Citizen's Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (hereinafter *"Delaware Valley I"*); *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

In the broadest sense, there are two areas of inquiry involved in the process of establishing a "reasonable fee" within the meaning of § 1988—the calculation of the "lodestar" (i.e. the number of hours expended multiplied by a reasonable hourly rate), *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983), and the consideration of whether the lodestar should be thereafter enhanced either because of the "quality" of the representation provided, *Blum,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891; *Delaware Valley I,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439, or, the "risk of loss" associated with counsel's decision to take the case, *Delaware Valley II,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585. Generally, the lodestar is "presumed to be the reasonable fee contemplated by § 1988". *Blum,* 465 U.S. at 897, 104 S.Ct. at 1548. Of course, the fee applicant bears the burden of proof relative to the calculation of the lodestar. Beyond that—if any adjustment, for example, enhancement, is sought—the fee applicant bears the additional burden of proving that any such adjustment is justified. *Blum,* 465 U.S. at 898, 104 S.Ct. at 1548.

**B.** *Attorney's Fees and Costs in this Case*

In the instant case, plaintiffs seek fees and costs totaling *$503,057.05* for the period of time from 1980 to December 1988. This figure reflects actual attorneys' fees through June 1988 of $208,219.50, with a fifty (50%) percent enhancement factor of $104,109.75; fees from July to December 1988 with no enhancement added, $8,475.00; and costs of $11,823.80. Defendants object to this request and submit this Court's § 1988 award for fees and costs should not exceed fees of $110,991.50 and costs of $10,300.31 for a total of *$121,-291.81.* Defendants also request that they be given the option of paying the award over more than one fiscal year.[1]

---

1. Defendants report that at present, the Grand Rapids Public School District projects a deficit

1. *Reasonable Hours.* On the issue of the number of hours for which an attorney should be compensated under § 1988, the Supreme Court in *Hensley* wrote:

> The party seeking an award of fees should submit evidence supporting the hours worked and the rates claimed. *Where the documentation of hours is inadequate, the district court may reduce the award accordingly.*
>
> The district court also should exclude from this initial fee calculation hours that were not "reasonably expended".... Cases may be overstaffed, and the skill and experience of lawyers vary widely. *Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary,* just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. In the private sector 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* are also not properly billed to one's *adversary* pursuant to statutory authority.

*Hensley,* 461 U.S. at 433–34, 103 S.Ct. at 1939–40. The *Hensley* Court approved the district court's reduction of one attorney's hours by 30% due to his inexperience and his failure to keep contemporaneous time records. *Hensley,* 461 U.S. at 438 n. 13, 103 S.Ct. at 1942 n. 13.

Other courts have likewise reduced the number of hours sought in a case of inexperience or when a lawyer does not keep contemporaneous time records, or under circumstances demonstrating duplication of effort or padding. *Northcross,* 611 F.2d at 636–37; *Coulter,* 805 F.2d at 152; *Kelley v. Metropolitan County Board of Education,* 773 F.2d 677, 683–84 (6th Cir.1985). In fact, in some Circuits, contemporaneous time records are a prerequisite for any fee award. *See, e.g., Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983); *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945 (1st Cir.1984).

The Sixth Circuit has also designed limits properly placed on the proportionate number of compensable hours which may be devoted to litigating the attorney fee issue. *Coulter,* 805 F.2d at 151. The court in that case set guidelines to ensure that the compensation from the attorney's fee case will not be grossly out of proportion to the civil rights case itself. The court concluded:

> In the absence of unusual circumstances, the hours allowed for preparing and litigating the attorney's fee case should not exceed 3% of the hours in the main case when the issue is submitted on the papers without a trial and should not exceed 5% of the hours in the main case when a trial is necessary.

*Id.*

The total hours claimed by plaintiffs for all counsel in this case is 1,931.50 hours. Most of those hours were expended by Albert Dilley, 1,176. Several other attorneys spent time on the case: John Burhans spent 226 hours; Mike Milroy spent 6 hours; and A.E. Dick Howard spent 173.50 hours. In addition, Nancy Dilley spent a total of 359 hours, 212 as a law clerk and the remaining time—after November 1982—as a lawyer. In support of their claim that this number of hours is reasonable, plaintiffs suggest that this Court look to the number of hours expended by opposing counsel. Such a comparison, according to plaintiffs, aids in determining whether there is duplication of hours between attorneys acting together on the same side of the case. *Stastny v. Southern Bell Telephone,* 458 F.Supp. 314 (W.D.N.C.1978).

■ On the subject of reasonable number of hours, defendants have three objections. First, defendants observe that within Attorney A. Dilley's hours, there is a request for 32 hours spent in connection with his post-judgment Motion for Declaratory Judgment and Additional Injunctive Relief. *See* Deposition Exhibit J, at 7–8. In that motion, however, plaintiffs challenged the Grand Rapids district's off-site programs which were implemented after this Court's decision in August 1982. That motion raised issues not involved in the scope of plaintiffs' suit—propriety of off-

of $8,000,000 to $10,000,000 for the next fiscal year.

site versus on-site instruction—and the motion was unsuccessful. Opinion, November 2, 1982 (W.D.Mich.). Thus, the 32 hours involved here should be deducted from the total hours sought. *Hensley,* 461 U.S. at 440, 103 S.Ct. at 1943 (hours on unsuccessful claims should be excluded from reasonable fee amount).

■ Second, defendants object to the reasonable hours figure that plaintiffs submitted because plaintiffs' attorneys "have virtually no contemporaneous time records and instead rely upon after-the-fact efforts Mr. Dilley to recreate what time was spent, when, and by whom." Defendants' Brief in Response to Fee Request, at 8 (Jan. 12, 1989). Defendants explain that all of the work sheets plaintiffs produced, *see* Deposition Exhibits J and K, were in fact prepared by Mr. Dilley alone—and not by the other attorneys requesting fees under § 1988. At his deposition, Mr. Dilley spoke about the process used in preparing the affidavits with time information which were submitted to the Court. He responded:

Q. Is that your handwriting on all of the pages?

A. I think it is.

Q. Where would the information have come from that you used to prepare this piece of paper?

A. Well, it would have come from the trial records, that is, notes that I have or had at that time indicated, of course, that John was present in trial May 10 to 13 for as long as we were there those days. Same way with May 17 to 20. And then before that, some preparation that that was taken from probably material that John made up.

Q. Let's taken an entry, for example, purposes, Mr. Dilley, let's take, for example, the entry that says, "May 5, 7, 8, prep for T." I assume that means preparation for trial.

A. Yes.

Q. And then it lists seven hours per day and a total of 21 hours.

A. Yes.

* * * * * *

Q. Okay. Now, in terms of preparing that entry, when in time did you prepare this piece of paper that we see as page one of Exhibit J?

A. (Pause) I don't know. I'd have to guess, but it was probably along in June —May, June, July, something like that, is the best guess I can make.

Q. Is it possible that this summary, for example, which is page one of Exhibit J, was prepared after the decision on the merits by Judge Enslen in August of 1982?

* * * * * *

A. It's possible, yes.

* * * * * *

Q. All right. This would then be an estimate, for example, of how much time he spent on those three days preparing for trial, as it says; would that be fair?

A. Yes.

Q. Okay. So if I said, Mr. Dilley, can you find me the paperwork or time slips that verify that he worked 21 hours, there wouldn't be any piece of paper that we could go and refer to in order to make sure—in order to decide whether he did work 21 hours or more than that or less than that?

A. That's right. There would not be any such slips.

* * * * * *

Q. Okay. Again, there would be no time slips somewhere with Nancy Dilley's name or initials on it?

A. No.

Q. For any one of the days listed on this piece of paper.

A. That's true.

Q. Would that—the rest of these time entries, would the same basic approach hold true, that is, that at some point in time you sat down and tried to recreate those hours that were spent by you and others by day in terms of working on the shared time project?

A. Most of them are that way, but some are not.

Q. Okay. Can you—

A. And the ones that are more recent in time are apt to be ones where I kept a

pad someplace, and when something happened on the case, then I would just make an entry as to how much time I spent on that particular day.

Q. When did you start doing that?

A. (Pause)

Q. As best you can recall.

A. Well, maybe I can sort of find one here. (Pause) I would say that of the method of taking it right off a pad that had current entries as we went along, certainly started by July of 1985.

A. Dilley Deposition, at 8–14 (Nov. 14, 1988).

Thus the Court observes that some reduction is necessary to reflect the fact that no attorney except Mr. A. Dilley kept contemporaneous time records, and he only kept them, in his words, "by July 1985". The Court observes that this factor primarily, and to a small extent, duplication of effort [2] justify a reduction in the number of compensable hours claimed. The Court is not satisfied that plaintiffs' reliance on defendants' time records are of significant assistance in this case. The beginning hour count from defendants covers bills for all services performed for their client, not just those relevant to the defense of the shared time case. Plaintiffs have the burden of demonstrating reasonable hours as part of the lodestar, and the following is an example of more guess than verification of actual hours spent on this case:

> Considering that the period covered by [Farr & Oosterhouse's] billings [to defendants] included commencement of the shared time case, all discovery including interrogatories and depositions, pretrial conferences, a 7–day bench trial, post-trial briefs and findings and conclusions, and post-judgment application of a stay in three courts, *the proportion of those services devoted to the shared time case*

*must have been sizable, certainly over 50%. As a considered estimate, let's assume the number of hours was 2,500.* For this same period of time from August 1980 to October 1982, plaintiffs' attorney and one attorney working with him, and a law clerk, expended a total of 959¼ hours according to the first Motion for Attorney Fees dated October 1982.

Plaintiffs' Final Brief, at 10 (Jan. 6, 1989). Also, as defendants argue, plaintiffs' use of defense counsel's hours is especially inappropriate in this case because plaintiffs' case was based on the alleged per se illegality of on-site instruction and was less involved than defendants' defense which was a fact-based approach designed to show that no actual constitutional violations had occurred.[3]

In essence, no attorney except Mr. A. Dilley kept contemporaneous time records, and he only began keeping those records about July 1985. Many of the hours claimed, then, are after-the-fact estimates which simply lack the precision required for full compensation under § 1988. For the foregoing reasons, I will reduce the hours claimed by ten (10%) percent, except for Mr. A. Dilley's time after July 1985.

▮ Defendants' third objection to the hours claimed is that plaintiffs have spent too much time on the attorney's fee case to be fully compensated. Under the standards set forth by the Sixth Circuit, for reasons of public policy, the hours compensable on the attorney's fee issue should be limited to three (3%) percent of all attorney time if the issue is decided without a trial, and five (5%) percent of all attorney time when a trial is required. *Coulter,* 805 F.2d at 151. Defendants acknowledge that this case is not easily classified under *Coulter* because of the initial appeal to the Sixth

---

**2.** Most of the hours by plaintiffs' counsel in this case were expended by Mr. A. Dilley, thus the duplication of effort factor is relatively small, but not non-existent. *See e.g.,* Affidavit of A.E. Dick Howard, at Exhibit B (Aug. 20, 1985) (oral argument preparation).

**3.** The Court is also unable to see how to accurately reflect the fact that Attorneys Farr and Oostema, representing defendant Grand Rapids

School District, were working cooperatively on the same side as Attorney Hubbell, representing intervening defendants, and Attorney Young, representing the State defendants. Since no records are available from Attorneys Young or Hubbell, any periods showing lessening or intensifying of workload due to cooperation of defense counsel cannot be identified in any meaningful way.

Circuit on the entitlement issue. Defendants request that the number of hours devoted to the attorney's fee issue be limited to 15% of the total hours expended on the civil rights case. Under the conservative position taken by the Sixth Circuit on the attorney's fee issue in *Coulter,* and with due regard for the important policy limitations articulated in that case, I believe that a 15% limitation on the hours spent on the fee issue is well within the boundaries of *Coulter.* Such a limitation is fair and promotes congressional intent, as expressed by the *Coulter* court:

> The legislative intent behind attorney fee statutes ... was to encourage lawyers to bring successful civil rights cases, not successful attorney fee cases. The attorney fee is not the case Congress expressed its intent to encourage; and in order to be included, it must ride piggyback on the civil rights case.

*Id.* at 151.

2. *Reasonable Hourly Rate.* Plaintiffs have set hourly rates for its lead attorney, Mr. A. Dilley at $150.00/hour for in court time and $100/hour for the remaining time in the original motion in the instant case. The time for a young lawyer with "special expertise" was billed at $75.00/hour and a clerk at $30.00/hour. Plaintiffs' supplemental motion included a request for hourly rates of $150.00/hour for the lead attorney and Professor A.E. Dick Howard, and $75.00/hour for a relatively small number of hours expended by two other less experienced lawyers. Plaintiffs used the same figure of $150.00/hour for the lead attorney in their Second Supplemental Motion of June 1988 and their Addendum filed in December 1988. Two other lawyers were billed at $100.00/hour and $85.00/hour.

The proper hourly billing rate is the fair market rate in the relevant community. The Supreme Court in *Blum* stated that "[t]he statute and legislative history established that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the relevant community...." 465 U.S. at 895, 104 S.Ct. at 1547. The Court elaborated on the mechanics of determining "prevailing market rates", as follows:

> To inform and assist the court in the exercise of its discretion, *the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.* A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate.

*Blum,* 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11 (emphasis supplied). *See also Northcross,* 611 F.2d at 638; *Kelley,* 773 F.2d at 683.

According to *Hensley, Northcross* and *Kelley,* an attorney's normal billing rate will often show the market value of the services provided. In determining the fair market value rate "an important indicator ... is the hourly rate [normally] charged by the attorney." *NAACP, Detroit Branch v. Detroit Police,* 620 F.Supp. 1173, 1183 (E.D.Mich.1985). Especially in cases involving particularly complex issues, "the special skill and experience of counsel should be reflected in the reasonableness of the hourly rates." *Blum,* 465 U.S. at 898, 104 S.Ct. at 1549. A court may also look beyond the local geographic market in considering the fair market value of an attorney's services. A national market for a particular legal specialization may provide the appropriate market. *See Louisville Black Police Officers Organiz. v. City of Louisville,* 700 F.2d 268, 278 (6th Cir.1983).

The normal billing rate, however, is not conclusive because it may be in excess of the market value for the services provided. In *Coulter,* the Sixth Circuit discussed fees to be awarded under § 1988, as follows:

> Such fees are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region. Under these statutes, a renowned lawyer who customarily received $250 an hour in a field in which the

competent and experienced lawyers in the region normally receive $85 an hour should be compensated at the lower rate. We therefore applied a principle that hourly rates for fee awards should not exceed the market rates necessary to encourage competent lawyers to undertake the representation in question.

805 F.2d at 149.

Defendants next object that various hourly rates sought by plaintiffs' counsel are unsupported by evidence concerning the prevailing market rates in the community. They maintain that, in general, the evidence on comparable rates is somewhat skimpy and even nonexistent as to some counsel. Defendants suggest that this Court use evidence it has related to the prevailing market rates in the relevant market, Attorney William Farr's affidavit. Defendants' Joint Brief, at 17 (Jan. 12, 1989). The Court will consider each of plaintiffs' counsel separately.

### a. Attorney Albert Dilley

█ Attorney Dilley is the lead counsel in this case. He graduated from law school in 1949 and was admitted to practice in the Michigan courts and federal district court in that same year. He practices in a small general practice firm—Dilley & Dilley—in Grand Rapids, Michigan, primarily in the fields of decedent estates; guardianships; real estate; domestic relations; and criminal law. Attorney Dilley is considered an expert on city annexation matters and has served as counsel in a small number of other First Amendment cases.[4] Affidavit of A. Dilley, at Plaintiffs' Exhibit A (Oct. 28, 1982). According to Attorney Dilley, his normal hourly rate ranged from $60.00/hour to $85.00/hour in 1980 to $85.00/hour to $150.00/hour in 1988. These rates varied according to the area of the law, however, and no hourly rates were provided for civil rights cases. Attorney Dilley also stresses that in considering a

reasonable hourly rate to be charged, he includes the following in his decision: complexity of the legal problem; amount involved; results achieved; and ability of the client to pay. Affidavit of A. Dilley, at 1–2, Deposition Exhibit D (Oct. 25, 1988). Attorney Dilley requested $100.00/hour for out-of-court time from 1980–1982. In-court time during those years and all time from late 1982–1988 is set at $150.00/hour.

Defendants argue that the proper rates to be used are $90.00/hour for partner time and $80.00/hour for associate time. They support these rate choices in several ways. First, defendants observe in general that the only evidence available to the Court as to Attorney Dilley are Attorney Dilley's own affidavits and the affidavit of Attorney Farr. In that affidavit, Attorney Farr stated the following:

> That the attorney fee rates per hour listed on the [billing summary for services provided to defendant Grand Rapids School District related to the shared time case] (i.e., $45–$90) are reasonable and consistent with the relevant market for such services over the time frame [of 1980 to 1988].

Affidavit of W. Farr, at 2, Defendants' Exhibit 1 (Aug. 16, 1988). Second, defendants call the Court's attention to the similarity of their proposed rates and Attorney Dilley's own billing rates. *See* Affidavit of A. Dilley, at Plaintiffs' Exhibit A (Oct. 28, 1982). Finally, according to defendants, Attorney Dilley's request for $150.00/hour (for some of the hours in this case) was not consistent with his normal billing rates. Deposition of A. Dilley, at 72–76 (Nov. 14, 1988).

I believe that Attorney A. Dilley should be compensated for the hours expended on this case at a rate of $125.00/hour.[5] The Court decreased the hourly figure from the $150.00/hour claimed by Attorney Dilley for the early in-court time and more recent hours because of defendants' evidence as

---

**4.** Attorney Dilley has handled four "church/state type" cases in his thirty nine year career. A. Dilley Deposition, at 66, Defendants' Exhibit 1 (Nov. 14, 1988).

**5.** The hourly rates set by this Court will reflect compensation for delay in payment, that is, I will use current hourly rates in calculating the lodestar. *See* Discussion of Interest, *infra* note 9 & accompanying text.

to billing rates, plaintiffs' counsel's own normal billing rates, the size of plaintiffs' counsel's law firm; the actual number of First Amendment cases conducted by Dilley; the firm's general practice; and to some extent, my own knowledge of prevailing rates. *See, e.g., Hall v. Borough of Roselle,* 747 F.2d 838 (3d Cir.1984); *Akron Center for Reproductive Health Care v. Akron,* 604 F.Supp. 1275 (N.D.Ohio 1985) (court's knowledge of rates based on past experience as practitioner and on previous attorney's fee cases).

### b. Professor A.E. Dick Howard

■ Professor Howard presented the argument on behalf of plaintiffs to the United States Supreme Court in December 1984. Professor Howard has been a faculty member of the University of Virginia Law School since 1964. He is currently the White Burkett Miller Professor of Law and Public Affairs at the law school. The accomplishments of Professor Howard are many, and too numerous to described individually. Briefly, he was a Law Clerk to Mr. Justice Hugo Black, Supreme Court of the United States from 1962–64, and is now a member of the Virginia and D.C. Bars. Active in public affairs, Professor Howard was executive director of the commission that wrote Virginia's new Constitution and directed the successful referendum campaign for ratification of that constitution. He has been counsel to the General Assembly of Virginia and a consultant to state and federal bodies, including the United States Senate Judiciary Committee. In January 1982 he was named as Counselor to the Governor of Virginia, and he chairs Virginia's Commission on the bicentennial of the United States Constitution.

An authority in constitutional law, Professor Howard is the author of a number of books, articles, and monographs. These include *The Road from Runnymede: Magna Carta and Constitutionalism in America* and *Commentaries on the Constitution of Virginia.* Professor Howard

did not prepare any statement for comparable legal services in 1984 which would be helpful in determining a billable rate for his time and services in his specialized area of constitutional law. There is evidence, however, that the organization Americans United for Separation of Church and State paid Professor Howard approximately $7,500.00 for his time spent on this case, 173 hours.[6] A. Dilley Deposition, at 47–50 (Nov. 14, 1988). Under *Blanchard v. Bergeron,* —— U.S. ——, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989), I must view a private fee arrangement as one of many factors to be considered in determining the lodestar figure. It in no way imposes an automatic limitation on my discretion, which according to the Supreme Court, is central to the operation of § 1988.

In *Blum v. Stenson,* the Supreme Court emphasized academic achievements, scholarship, clerkship experience, and specialized expertise as bearing upon the reasonable hourly rate figure. *Blum v. Stenson,* 465 U.S. at 890 n. 4, 899 n. 15, 104 S.Ct. at 1544 n. 4, 1549 n. 15. Some lower courts have been less generous. *See Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 955 (1st Cir.1984) (admitted academic excellence does not necessarily amount to trial and appellate litigation skills); *In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1296, 1328–30 (E.D.N.Y.1985) (reduced rate in common fund case because law professors are guaranteed salary and have no overhead). I believe that a guaranteed income from a salary or otherwise is irrelevant to the question of a reasonable hourly rate. The legislative history of § 1988 speaks of a reasonable fee as one that is "adequate to attract competent counsel." *Delaware Valley I,* 478 U.S. at 564–67, 106 S.Ct. at 3098–99, 92 L.Ed.2d at 456–57. The *Delaware Valley II* Court also stated that federal fee-shifting statutes, including § 1988, "were not designed as a form of economic relief to improve the

---

**6.** At his deposition, Attorney Dilley disclosed that Professor Howard agreed to handle the oral argument in this case for a flat fee—$7,500. Defendants point out that the hourly rate suggested by defendants in fact compensates Professor Howard at a higher level than the *actual* rate he agreed to if one takes the amount agreed upon and divides by the number of hours claimed. ($7,500 divided by 173.5 hours equals $43.22/hour).

financial lot of attorneys." *Id.* Hence, the emphasis in the attorney's fees cases has been on the market or on the individual in the market and not on the highly individual financial incentives to take or reject a particular case.[7] Where statutory assurance allows a plaintiff to retain competent counsel, the purpose of the fee-shifting statute is actualized. *Id.; Coulter v. Tennessee,* 805 F.2d 146, 147–49 (6th Cir.1986).

While I agree with the First Circuit that not all of the skills of trial and appellate litigation are necessarily subsumed under academic excellence, it is also true that judges are favorably inclined toward knowledgeable, clear-thinking, articulate counsel. And whereas a well-respected legal scholar may not have the procedural acumen of a seasoned trial attorney, in this case I face facts which consist of a constitutional law professor making oral argument before the Justices of Supreme Court of the United States. The specialized skills necessary to accomplish this task properly seem quite consistent with someone with Professor Howard's background.

This said, the evidence before me is nil as to rates paid him in prior comparable cases. There is only evidence that Professor Howard received some $7,500.00 for his work on this case. This is helpful evidence, but under *Blanchard* is only a starting point. The expectation of reasonable fees due to statutory assurance may *also* have played a part in the decision to assist these plaintiffs with their lawsuit. Thus based on Professor Howard's qualifications and experience, in combination with the evidence about the fee he has already received, I will set a reasonably hourly rate at $150.00/hour.

c. *Attorneys Nancy Dilley, Michael Milroy, John Burhans*

■ Nancy Dilley was graduated from Cooley Law School and admitted to practice in 1982, and immediately joined the firm of Dilley & Dilley, Grand Rapids, Michigan. She has practiced in the fields of civil rights, workers' compensation, personal injury, bankruptcy, and domestic relations. Her recent hourly billing rates are roughly $100.00/hour. No rates were provided for civil rights cases. Affidavit of Nancy Dilley, Deposition Exhibit F (Oct. 26, 1988).

Michael Milroy also assisted Attorney Dilley in this case. He graduated from Cooley Law School in 1982, was admitted to practice in 1983, and was in the employ of Dilley & Dilley at the time this case was on appeal in 1986 and 1987. He assisted in preparation of the briefs and appendix. Second Supplemental Affidavit of Albert Dilley, Deposition Exhibit C (June 15, 1988).

John Burhans graduated from law school in 1980, and was admitted to practice in Michigan in 1980. After taking the bar examination, he was employed as a law clerk to a Judge of the Territorial Court of the Virgin Islands before accepting a law clerk position with the Honorable Douglas W. Hillman, U.S. District Judge for the Western District of Michigan. Attorney Burhans took on this and other private cases following his clerkships, and assisted in trial preparation in this case, for example, he organized evidence for the case. He also performed some post-trial work. Affidavit of John Burhans, Deposition Exhibit E (Oct. 28, 1988).

The hourly rate requested on behalf of Attorney N. Dilley varies. In this first motion, her services are billed at a rate of $30.00/hour.[8] Thereafter, her hourly rate is $75.00/hour in the supplemental motion and $100.00/hour in the last two motions. Attorney J. Burhans requests $75.00/hour for his services. The few hours expended by Attorney M. Milroy are billed at $85.00/hour.

These individuals are properly classified as associate-level attorneys in a small, gen-

---

7. By this reasoning, *In re Agent Orange* suggests that an attorney with a secure and lucrative practice should have his or her hourly rate reduced or that attorney fees should somehow be calculated based on "other income" and the financial need of the attorney.

8. At the time she was a law clerk, her time is billed at $30.00/hour. Later, when she became an attorney, her hourly rate was increased substantially.

eral practice firm in the relevant market. Given these attorneys' backgrounds, experience, the evidence about plaintiffs' individual and firm billing rates and the evidence of defendants' recent billing rates, I believe $80.00/hour for work performed in this case is a reasonable hourly rate. Of course, Nancy Dilley's work prior to the time she became an attorney should be compensated at a lower rate, as the parties agree, at $30.00/hour.

All of the hourly rate figures were calculated so as to compensate for delay in payment, that is, the Court used current hourly rates in calculating the lodestar. Under *Library of Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1985), compensation for delay in payment—by paying current hourly rates or historical rates with some upward adjustment—serves the same end as an award of interest. Of course, to permit compensation for delay in payment *and* to award interest would doubly reimburse plaintiffs.[9]

### 3. *Fee Award Enhancement*

■ Plaintiffs request an upward adjustment of the reasonable rate times reasonable hours, or lodestar, figure. This upward adjustment, commonly called a multiplier, is not an unfamiliar factor in § 1988 cases. In *Northcross v. Memphis City Schools*, 611 F.2d 624, 638 (6th Cir.1979),

the court stated that it was not bound to the lodestar amount. It continued, as follows:

> In many cases [the hourly] rate is not 'reasonable' because it does not take into account special circumstances, such as unusual time constraints or an unusually unpopular cause, which affect the market value of the services rendered. Perhaps the most significant factor in these cases which at times renders the routine hourly fee unreasonably low is the fact that the award is contingent upon success. An attorney's regular hourly billing is based upon an expectation of payment, win, lose or draw. If he or she will only be paid in the event of victory, these rates will be adjusted upward to compensate for the risk the attorney is accepting of not being paid at all. Some cases under the civil rights statutes, those in which the facts are strong and the law clear, pose little risk of losing, and the attorney's normal billing rate will be adequate compensation. Others, in developing areas of law or where the facts are strongly disputed, will require a substantial upward adjustment to compensate for the risk.

Put another way, under "special circumstances", an award of attorney fees "equal to the lodestar amount is unreasonable." *Berry v. Benton Harbor School District,*

**9.** Plaintiffs seek interest on their proposed attorney fee award computed at the rate of 12% per annum from the date of the filing of their Complaint under the "authority" of Michigan's judgment interest statute—M.C.L.A. § 600.6013. They cite *Gates v. Collier*, 616 F.2d 1268 (5th Cir.1980) as supportive authority for their request.

In *Gates*, however, attorney fees were awarded first in 1973 and again in 1976. In its 1980 decision, the Court of Appeals was analyzing whether the trial court could properly allow interest on those previously-entered awards in view of the delay between the entry of those awards, and the date of payment. Hence, unlike the present situation, *Gates* was a post-attorney fee award case where interest was used to compensate for a lengthy delay between the award itself, and payment. That is not the case here since no award has yet been made.

Indeed, *Gates* was distinguished on that basis in *Wojtkowski v. Cade*, 725 F.2d 127 (1st Cir. 1984) by the First Circuit. There, plaintiff specifically, requested pre-award interest—as plaintiffs do here—as part of the attorney fee award. The court refused to do so, distinguishing the *Gates* case. In affirming the district court's handling of the interest issue, the Court of Appeals stated:

> [Plaintiff] claim[s] that he was entitled to prejudgment interest on the amount allowed by the Court as attorney's fee under § 1988 has even less force. Section 1988 does not refer to interest, nor has our attention been drawn to any federal statute that calls for pre-judgment interest in this particular context.... The district court did not err in denying [plaintiff's] request for pre-judgment interest on his attorney's fee award.

*Wojtkowski*, 725 F.2d at 129–30.

Plaintiffs have cited no authority to support use of Michigan's judgment interest statute in a federal case where federal question jurisdiction is asserted. To the contrary, federal question cases are governed by federal law—not state law. *Wojtkowski v. Cade*, 725 F.2d 127, 129 (1st Cir.1984). A state judgment interest statute is not applicable here.

703 F.Supp. 1277, 1284 (W.D.Mich.1986). When necessary, a court should adjust the lodestar amount to "arrive at a reasonable fee." *Id.* at 1284.

Plaintiffs' counsel in this case seek a multiplier, or enhancement of the lodestar figure for four reasons. First, they argue that plaintiffs succeeded on every issue presented the Court. Moreover, plaintiffs maintain that they achieved these "exceptional results" in a case of critical importance in the field of public education and church-state separation. Affidavit of A. Dilley, Deposition Exhibit C, at 3–4 (June 15, 1988). In fact, plaintiffs suggest that *Grand Rapids School District v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), "has become a landmark case in the field of First Amendment jurisprudence. It is cited, and often quoted, in nearly every new opinion rendered in this area of constitutional law." *Id.* at 4.

Second, plaintiffs observe that from a purely financial perspective, taxpayers of the State of Michigan realized a saving of three million dollars per year from termination of the Grand Rapids shared-time program alone. Similar programs throughout the State were terminated following the Supreme Court decision in July 1985. As of this date in 1988, at least $27,000,000 in taxpayer funds have been saved as a result of this decision. Affidavit of A. Dilley, Deposition Exhibit A, at 5 (Oct. 28, 1982).

Third, according to plaintiffs, the filing and prosecution of this case in the West Michigan area produced a hostile reaction against plaintiffs and their attorney from members of the affected religious group. *Id.* at 7–8. The process of proving plaintiffs' case in Court became a difficult matter. The case presents a possibly unique example of plaintiff's case being proved entirely by hostile witnesses, but it was not a pleasant experience for plaintiffs or their attorney.

Finally, plaintiffs' counsel reports that he realized that any attorney fee was contingent on the outcome of the case. While Attorney A. Dilley received some funds from Americans United for Separation of Church and State, he states that he remains largely unreimbursed for "eight years of litigation through three Courts." Plaintiffs' Final Brief in Support of Attorney Fees, at 6 (Jan. 6, 1989).

Defendants argue that contrary to *Northcross,* the Supreme Court has continually narrowed the circumstances under which an enhancement of an attorney fee award may be made. They ask this Court to reject any enhancement, stressing that under *Delaware Valley II,* plaintiffs cannot show that they would have had difficulty obtaining counsel absent the possibility of a fee enhancement award. Defendants argue forcefully that at its genesis, this case was initiated by Attorney Dilley's activities as a "cooperating lawyer" for Americans United Separation of Church and State. Deposition of A. Dilley, at 32–39 (Nov. 14, 1988). Further, although another attorney signed the complaint, Attorney Dilley eventually decided to take over the case when he became unhappy with the way he was being kept apprised of the status of the litigation. Deposition of A. Dilley, at 57–58 (November 14, 1988). Defendants maintain that Attorney Dilley clearly handled this case because of his personal convictions on the subject—not because of any thought that he might receive a "contingency multiplier" if successful. *Id.* at 70–71. In fact, according to defendants he never even considered the possibility of obtaining attorneys fees until he won the case. *Id.* at 82–83.

The Court in *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983), suggested that an enhanced award might be justified "in some cases of exceptional success." In explaining the limited availability of the "quality" multiplier, the *Blum v. Stenson* Court stated:

> The statute requires a 'reasonable fee' and there may be circumstances in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high. When, however, the applicant for a fee has carried his burden of showing that the

claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee contemplated by § 1988.

The issue remaining is the appropriateness of an upward adjustment to the fee award in this case. *The burden of proving that such an adjustment is necessary to the determination of a reasonable fee is on the fee applicant.*

465 U.S. 886, 897–99, 104 S.Ct. 1541, 1548–49, 79 L.Ed.2d 891 (1984) (emphasis added).

The Court then went on to criticize certain factors used by the district court:

The reasons offered by the district court to support the upward adjustment do not withstand examination. The novelty and complexity of the issues presumably were fully reflected in the number of billable hours recorded by counsel and thus do not warrant an upward adjustment in a fee based on the number of billable hours times reasonable hourly rates. There may be cases, of course, where the experience and special skill of the attorney will require the expenditure of fewer hours than counsel normally would be expected to spend on a particularly novel or complex issue. In those cases, the special skill and experience of counsel should be reflected in the reasonableness of the hourly rates. Neither complexity nor novelty of the issues, therefore, is an appropriate factor in determining whether to increase the basic fee award.

*Id.*

In *Delaware Valley I,* the Supreme Court reviewed the various principles set forth in *Blum v. Stenson,* and stated that there is a "strong presumption" that the lodestar figure represents the reasonable fee contemplated by fee-shifting statutes when a "quality of representation" multiplier is sought. 478 U.S. at 565, 106 S.Ct. at 3098, 92 L.Ed.2d at 456. The Court elaborated as follows:

In short, the lodestar figure includes most, if not all, of the relevant factors comprising a 'reasonable' attorney's fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance.

478 U.S. at 566, 106 S.Ct. at 3098, 92 L.Ed.2d at 457.

As I have previously observed, *Delaware Valley II* is, to say the least, a confusing case. In that case, a plurality of the Court concluded that fee shifting statutes such as § 1988 should not be construed to permit supplementing the lodestar to compensate counsel for assuming the risk of nonpayment of fees. *Pennsylvania v. Delaware Valley Citizens' Council,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). The plurality went on to reason, however, that even if such enhancements are available, an enhancement was inappropriate in that case. The plurality questioned enhancements based upon the risk of nonpayment for two reasons. First, such enhancements compensate plaintiffs' counsel for having lost other cases, while Congress intended to compensate counsel only when they prevail. Second, such enhancements tend to penalize the defendants who have the most meritorious cases, rather than those whose cases are weak. *Id.* at 724, 107 S.Ct. at 3086, 97 L.Ed.2d at 597. The plurality also concluded, however, that if a risk-based enhancement is appropriate, it "should be reserved for exceptional cases where the need and justification for such enhancement are readily apparent and are supported by evidence in the record and specific findings by the courts." *Id.* at 728, 107 S.Ct. at 3088, 97 L.Ed.2d at 599. Thus, in order to levy a risk-based enhancement, the trial court should find "that without risk enhancement plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market." *Id.* at 731, 107 S.Ct. at 3089, 97 L.Ed.2d at 601.

Justice O'Connor's concurring opinion held that "Congress did not intend to foreclose consideration of contingency in setting a reasonable fee under fee-shifting provisions...." *Id.* at 731, 107 S.Ct. at 3089, 97 L.Ed.2d at 601. She found that "compensation for contingency must be based on the difference in market treatment of contingent fee cases *as a class* rather than on an assessment of the 'riski-

ness' of any particular case." *Id.* Justice O'Connor agreed with the plurality's opinion that risk-based enhancements should be available only where plaintiffs can show an inability to retain competent counsel without the enhancement and with its conclusion that an enhancement was unnecessary in that case. *Id.* at 734, 107 S.Ct. at 3091, 97 L.Ed.2d at 603.

*Delaware Valley* may be read to limit the availability of fee enhancements or multipliers even beyond the limitations imposed by *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In *Blum,* the Court found that the lodestar figure, the product of reasonable hours and a reasonable hourly rate, "is presumed to be the reasonable fee contemplated by § 1988." *Id.* at 897, 104 S.Ct. at 1548. Enhancement of the lodestar is available in cases of exceptional success or where the "basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is ... unreasonably low...." *Id.* The Court further found that a number of factors used to justify enhancements, such as the novelty and complexity of the issues involved, the quality of representation or the results obtained, were inappropriate reasons for increasing an otherwise reasonable fee. *Id.* at 898–900, 104 S.Ct. at 1548–50.

The Supreme Court's decisions in *Delaware Valley* and *Blum* leave at least one avenue available for enhancing the attorneys' fees available here under § 1988. Justice O'Connor and the *Delaware Valley* plurality agreed that an enhancement would be available where "necessary to attract competent counsel in the relevant

community." 483 U.S. at 734, 107 S.Ct. at 3091, 97 L.Ed.2d at 603.

Yet plaintiffs suggest four factors which do not support an enhancement under *Blum* and *Delaware Valley.* *Blum* states explicitly that the results obtained do not justify enhancing an otherwise reasonable fee. *Blum,* 465 U.S. at 898–900, 104 S.Ct. at 1548–50. Thus factors 1 (exceptional results on issues in case) and 2 (results of case saving taxpayers' funds) are not properly considered as support for a multiplier. Under factors 3 (hostile reaction from religious community) and 4 (contingent fees), plaintiffs do not provide evidence that, under *Blum* and *Delaware Valley,* plaintiffs would have faced substantial competent difficulties in retaining counsel without the enhancement. I see no evidence to support enhancing the reasonable fee, thus I will deny this part of plaintiffs' request.

### 4. Reasonable Costs

■ Plaintiffs seek a total of $11,823.80 in expenses as part of their § 1988 award. Defendants object to the following three items on the expense list totalling $1,523.49:

| Description | Amount |
| --- | --- |
| Lunch for eight people at the Hyatt in Washington, D.C. on December 4, 1984 | $ 89.11 |
| Lunch for 22 people at Monocle's in Washington, D.C. on December 5, 1984 | $ 186.45 |
| Dinner for 16 people at the Madison in Washington, D.C. on December 5, 1984 | $1,247.93 |

Defendant argues that under the circumstances it would be patently unreasonable to require defendants to pay these expenses.[10] In sum, defendants object to

---

**10.** Attorney A. Dilley testified as to who was present on these three occasions, as follows:

Q. Who were the eight people there [at the December 4, 1984 lunch], do you remember?
A. I would say probably the President of Americans United and the attorney, Lee Boothby, and probably two or three other members of the board, and Nancy was probably there. That's about it.

\* \* \* \* \* \*

Q. Can you tell me who the twenty-two people were [at the December 5, 1984 lunch]?
A. Well, those would have been all of the people who were most closely connected with

our case. They were—there were, oh, three or four attorneys, such as the attorney for the American Jewish Congress and the—the Baptist Group, and, of course, the ones from Americans United, and then a lot of the parties themselves, the Amicus parties, the organizations and also people who have acted as plaintiffs in, well, for example, the companion case that was heard in the Supreme Court on the same day as ours.
Q. The *Aguilar* case?
A. Yes.
Q. So some of those people would have been at this luncheon as well?

paying expenses for individuals who had little or nothing to do with this case. They also point out that in December 1984, Americans United for Separation of Church and State had been dismissed as a party plaintiff.

Section 1988 has been construed, as a general rule, to allow reimbursement for all reasonable out-of-pocket expenses incurred by prevailing counsel which normally are charged separately to fee-paying clients and which are not incorporated as part of office overhead into the attorneys' billing rates. *See Kuzma v. I.R.S.*, 821 F.2d 930, 933–34 (2d Cir.1987) (§ 1988 fees include recovery of photocopying, travel and telephone costs, as distinct from "nonrecoverable routine office overhead"); *Mennor v. Fort Hood National Bank*, 829 F.2d 553, 556–557 (5th Cir.1987) (allowing recovery for postage, long-distance telephone calls and travel in Title VII case); *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 30 (D.C.Cir.1984); *Henry v. Webermeier*, 738 F.2d 188, 192 (7th Cir.1984); *Ramos v. Lamm*, 713 F.2d 546, 559 (10th Cir.1983).

Defendants' point is well-taken. I will not award costs for expenses that would not be properly charged to fee-paying clients. These expenses will be deducted from the award of costs.

Therefore, in sum I will reduce the hours claimed by ten (10%) percent except for Attorney A. Dilley's time after July, 1985. As discussed I will also subtract 32 hours spent by Attorney A. Dilley. The number of hours related to the attorney's fee issue will also be limited to fifteen (15%) percent of the underlying case under *Coulter.*

The attorneys in this case will be compensated at the following rates:

| Attorney A. Dilley | $125.00/hour |
| Professor A.E. Dick Howard | $150.00/hour |
| Attorney N. Dilley | $80.00/hour (as a lawyer) |
| | $30.00/hour (as a clerk) |
| Attorney M. Milroy | $80.00/hour |
| Attorney John Burhans | $80.00/hour |

No fee enhancement award is justified. A sum of $1,523.49 will be subtracted from the reasonable costs total. The total fees and costs award in this case, therefore, is $175,892.26.[11] *See* Appendix, Tables 1–6.

APPENDIX: Table 1
Summary of Hours Submitted by Plaintiffs' Counsel

| | Albert Dilley | John Burhans | Nancy Dilley | Mike Milroy | Prof. Howard | Total Hours |
|---|---|---|---|---|---|---|
| Hours before trial ct's Decision in 8–82 | 401.25 | 216 | 75* | 0 | 0 | 692.25 |

A. Yes, some of those people as well. That's the kind of people who were there.

\* \* \* \* \* \*

Q. Now, the last entry, dinner for sixteen persons at the Madison on December 5, I take it dinner means at night?
A. Yes.
Q. And who all was involved in that dinner?
A. Well, they were mostly the Americans United people, and, let's see, Dick Howard and his lady friend, Lee Boothby and let's see, I can't remember now whether the Bakers were there, John Baker from the Baptist Association. I believe he was. And then members of my family, my wife, my son Fred and his wife. That's about it.

\* \* \* \* \* \*

Q. And this was attended not just by lawyers or parties, this was also attended by spouses?
A. Oh, yes.

\* \* \* \* \* \*

Q. What does this $1,200 expenditure have to do with the merits of whatever's got to do in this case?
A. I suppose that's up to you to decide that.
Deposition of A. Dilley, at 24–28 (Nov. 11, 1988).

11. I must deny, however, defendants' request to have the option of paying the award over more than one fiscal year. The total award reflects current fee rates so as to compensate for the delay in payment thus far. I will not distort these carefully drawn figures. It is also clear to me that plaintiffs have waited long enough.

|  | Albert Dilley | John Burhans | Nancy Dilley | Mike Milroy | Prof. Howard | Total Hours |
|---|---|---|---|---|---|---|
| Hours between trial ct's Decision and U.S. S.Ct.'s affirmation in 7–85 | 492.00 | 10 | 175* | 0 | 173.50 | 850.50 |
| Hours since U.S. S.Ct.'s affirmation in 7–85 | 282.75 | 0 | 100 | 6 | 0 | 388.75 |
| Total Hours | 1,176.00 | 226 | 350** | 6 | 173.50 | 1,931.50 |

\* Law Clerk until November 1982
\*\* 212 hours as Law Clerk

APPENDIX: Table 2

Summary of Plaintiff Counsel's Time Devoted to Attorney Fee Issue

| Attorney | Claimed Hours | Reduced Hours [1] |
|---|---|---|
| Albert Dilley (Contemporaneous time records after July, 1985 | | |
| Before 8/82 | 0 | 0 |
| Before 7/85 | 37.00 | 33.30 |
| After 7/85 | 282.75 | 282.75 |
| Total Hours | 319.75 | 316.05 |
| Nancy Dilley (No contemporaneous time records ever; admitted to practice, November 1982) | | |
| Before 8/82 | 0 | 0 |
| Before 11/82 | 80.00 | 72.00 |
| After 11/82 | 103.00 | 92.70 |
| Total Hours | 183.00 | 164.70 |
| Total Hours on Attorney Fee Issue | 502.75 | 480.75 |
| Total Hours by all Attorneys on all Issues | 1,931.50 | 1,737.83 [2] |
| Percentage of Hours Spent on Fee Issue | 26.0% | 27.7% |

[1] These hours are 90% of the claimed hours, based on the reduction for the failure to keep contemporaneous time records and for duplication of efforts, except that Mr. Dilley's time after 7/85 is calculated at 100% of his claimed hours.

[2] This total reduced hours is obtained by starting with the total claimed hours of 1,931.50. From this the 32 hours on the unrelated issue is subtracted. 282.75 is then subtracted (for the time that Mr. Dilley kept contemporaneous time records) and the remainder is multiplied by 90% (giving 1,455.08). To this the 282.75 is added, giving the total compensable time (apart from the reduction for the attorney's fee issue) as 1,737.83.

APPENDIX: Table 3

Hours to be Deducted for Excess Time on Attorney Fee Issue

|  | Hours |
|---|---|
| Total hours (after deduction for non-comtemporaneous time-keeping | 1,737.83 [1] |
| Total hours spent on attorney fee issue (after reductions for non-contemporaneous time-keeping (see Table 2) | 480.75 |
| 15% of total hours (which represents maximum amount compensable on this issue) | 260.67 |
| Excess hours that need to be deducted (which is the difference between total hours spent on attorney fee issue minus 15% of total hours | 220.08 |
| Percent of time on attorney fee issue to be deducted | 45.7% |
| Amount of hours to be deducted from Albert Dilley's time: | |
| Time spent on attorney fee issue (see Table 2) | 316.05 |
| Multiplied by 45.7% × | .457 |
| Time to be deducted | 144.43 |
| Amount of hours to be deducted from Nancy Dilley's time | |
| As Law Clerk | |
| Time spent on attorney fee issue (see Table 2) | 72.00 |
| Multiplied by 45.7% × | .457 |
| Time to be deducted | 32.90 |

| As Attorney | | Hours |
|---|---|---|
| Time spent on attorney fee issue (see Table 2) | | 92.70 |
| Multiplied by 45.7% | × | .457 |
| Time to be deducted | | 42.36 |

1. See footnote 2 to Table 1 for the calculations utilized to arrive at this figure.

## APPENDIX: Table 4
### Hours to be Compensated

Albert Dilley

| Before 7/85 (no contemporaneous time records) | | |
|---|---|---|
| Total claimed (see Table 1) | | 893.25 |
| Unrelated issue | − | 32.00 |
| Total | | 861.25 |
| Multiplied by | × | .90 |
| Pre–7/85 Hours | | 775.13 |
| After 7/85 (contemporaneous time records) | | |
| Total claimed (see Table 1) | | 282.75 |
| Total (before and after 1985) | | 1,057.88 |
| Deduction for excess hours on attorney fee issue | | 144.43 |
| Total Compensable Hours | | 913.45 |

Nancy Dilley

(No contemporaneous time records ever; admitted to practice, November, 1982)

| As Clerk | | |
|---|---|---|
| Total claimed (see Table 1) | | 212.00 |
| Multiplied by 90% | × | .90 |
| | | 190.80 |
| Deduction for excess time spent on attorney fee issue | | 32.90 |
| Total Compensable Hours | | 157.90 |
| As Attorney | | |
| Total claimed (see Table 1) | | 138.00 |
| Multiplied by 90% | × | .90 |
| | | 124.20 |
| Deduction for excess time spent on attorney fee issue | | 42.36 |
| Total Compensable Hours | | 81.84 |

John Burhans

| (No contemporaneous time records) | | |
|---|---|---|
| Total claimed (see Exhibit 2) | | 226.00 |
| Multiplied by 90% | × | .90 |
| Total Compensable Hours | | 203.40 |

Mike Milroy

| (No contemporaneous time records) | | |
|---|---|---|
| Total claimed (see Exhibit 2) | | 6.00 |
| Multiplied by 90% | × | .90 |
| Total Compensable Hours | | 5.40 |

Professor A.E. Richard Howard

| (No contemporaneous time records) | | |
|---|---|---|
| Total claimed (see Exhibit 2) | | 173.50 |
| Multiplied by 90% | × | .90 |
| Total Compensable Hours | | 156.15 |

APPENDIX: Table 5

Total Attorney Fees

| Name | Compensable Hours* | Hourly Rate | Total |
|---|---|---|---|
| Albert Dilley | 913.45 | $125.00 | $114,181.25 |

| Name | Compensable Hours* | Hourly Rate | Total |
|---|---|---|---|
| Nancy Dilley | | | |
| As Clerk | 157.90 | $30.00 | $4,737.00 |
| As Attorney | 81.84 | $80.00 | $6,547.20 |
| John Burhans | 203.40 | $80.00 | $16,272.00 |
| Mike Milroy | 5.4 | $80.00 | $432.00 |
| Professor A.E. Dick Howard | 156.15 | $150.00 | $23,422.50 |
| Total Attorney Fees | | | $165,591.25 |

* See Exhibit 5

APPENDIX: Table 6

Summary of Expenses Claimed by Plaintiffs

| Source | Amount |
|---|---|
| Dilley Affidavit—1985 | $10,147.85 |
| Dilley Affidavit—June, 1988 | 1,535.39 |
| Dilley Affidavit—December, 1985 | 140.56 |
| Total Expenses | $11,823.80 |
| Less Contested Washington, D.C. Expenses | − 1,523.49 |
| Total Uncontested Expenses | $10,300.31 |
| TOTAL FEES AND COSTS | $175,892.26 |